Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew F. Kennelly | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 1725 | **DATE** | 6/28/2000 |
| **CASE TITLE** | Abbott Laboratories vs. Dey, L.P. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due _____. Reply to answer brief due _____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry]  Enter Memorandum Opinion and Order. Enter ruling on claim construction and application of doctrine of equivalents.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 5 number of notices | Document Number |
| | No notices required. | | | |
| | Notices mailed by judge's staff. | | JUN 30 2000 date docketed | |
| | Notified counsel by telephone. | | | |
| ✓ | Docketing to mail notices. | | UMJ docketing deputy initials | 50 |
| | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | | JUN 30 2000 date mailed notice | |
| OR | courtroom deputy's initials | Date/time received in central Clerk's Office | UMJ mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

ABBOTT LABORATORIES, )
MITSUBISHI-TOKYO )
PHARMACEUTICALS, INC. f/k/a )
TOKYO TANABE CO., LTD., )
)
Plaintiffs, )
)
v. ) Case No. 00 C 1725
)
DEY, L.P. and DEY, INC., )
)
Defendants. )

JUN 3 0 2000

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

In this patent case, Tokyo Tanabe Company, Ltd., now known as Mitsubishi-Tokyo Pharmaceuticals, Inc., and its exclusive United States licensee, Abbott Laboratories, have sued Dey, L.P. and Dey, Inc., for infringement of U.S. Patent No. 4,338,301 (the '301 patent) and U.S. Patent No. 4,397,839 (the '839 patent), which cover respectively an extract from mammalian lung tissue useful for treating hyaline-membrane disease and a method for producing the extract and a surface active material and process for preparing the material. Under the licensing agreement with Tanabe, Abbott used the technology covered in the patents to make Survanta®, a surfactant[1] product used to treat Respiratory Distress Syndrome in premature babies. Abbott received FDA approval to market and distribute Survanta® in 1991 and has marketed and

---

[1] Surfactant, as used in this context, is a biochemical substance that coats the alveoli in the lungs, allowing them to expand and contract more easily during respiration. Mature lungs produce surfactant, but the substance is often found lacking in the lungs of premature babies, causing them to suffer Respiratory Distress Syndrome.

distributed the product since that time. In November 1999, the FDA granted Dey approval to market and distribute Curosurf®, a surfactant replacement product also derived from mammalian lungs. In this action, Tanabe and Abbott allege that Curosurf® and its components fall within the scope of at least one claim of the '301 patent and at least one claim of the '839 patent. The plaintiffs have moved for a preliminary injunction prohibiting Dey from making, using, selling, offering to sell, or importing Curosurf® until the '839 patent expires on June 1, 2005.[2] The Court has scheduled a hearing on the preliminary injunction motion for July 6, 2000.

The purpose of this Order is to address and resolve two preliminary issues. The first issue involves the effect, if any, of a 1998 decision issued by Judge Richard Arcara in *Forest Laboratories, Inc. and ONY, Inc. v. Abbott Laboratories and Tokyo Tanabe Company, Ltd.*, No. 96 CV-159A, in the Western District of New York concerning the construction of certain claims of the '301 and '839 patents. The second issue involves whether the plaintiffs are entitled to rely on the doctrine of equivalents to prove that Dey's product infringes the claims of the patents in suit or whether Tokyo Tanabe relinquished the right to pursue infringement under that doctrine in the way it prosecuted the patent.

The Effect of Judge Arcara's Decision

Defendants argue that Judge Arcara construed the same claim language that is disputed in this case and that his construction should carry the day here as well; they contend that the doctrine of issue preclusion bars plaintiffs from relitigating those claim construction issues.

---

[2] The '301 patent expired May 21, 2000. The Court took these dates from Judge Arcara's decision and accepts them as true, though in their supplemental brief plaintiffs submitted a copy of a request for extension of the '839 patent and the certificate extending the patent term which suggest that the patent may expire in early 2004.

2

Plaintiffs argue that the Court should not apply issue preclusion in this case because to do so would be unfair to them.

The doctrine of issue preclusion compels a court to honor the first actual decision of a matter that has been litigated. *See Chicago Truck Drivers v. Century Motor Freight*, 125 F.3d 526, 530 (7th Cir. 1997) (citing 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* §4416, at 136 (1981 & Supp. 1997)).[3] Generally, issue preclusion is appropriate if: (1) the issue sought to be litigated is identical to one decided in a prior action; (2) that issue was actually litigated in the first action; (3) the determination of the issue was essential to the final judgment in the first action; and (4) the party against whom estoppel is invoked had a full and fair opportunity to litigate the issue in the first action. *Century*, 125 F.3d at 530 (citing *La Preferida, Inc. v. Cerveceria Modela, S.A. de C.V.*, 914 F.2d 900, 906 (7th Cir. 1990)); *A.B. Dick Co. v. Burroughs Corp.*, 713 F.2d 700, 702 (Fed. Cir. 1983), *cert. denied*, 464 U.S. 1042 (1984). All of these conditions are met here. The claim construction issues disputed in this case are the same issues litigated in the *Forest* case; Abbott and Tokyo Tanabe briefed and argued the issues before Judge Arcara, and the judge's claim construction ruling was necessary to the final judgment in the case concerning infringement.

But that does not end the inquiry. In some circumstances, even when these conditions are met, the court may decline to apply issue preclusion. The United States Supreme Court, the

---

[3]The Court looks to Seventh Circuit law because that is where the Federal Circuit would turn in applying issue preclusion in this case. *See Epic Metals Corp. v. H.H. Robertson Co.*, 870 F.2d 1574, 1576 (Fed. Cir.), *cert. denied*, 493 U.S. 855 (1989); *Hartley v. Mentor Corp.*, 869 F.2d 1469, 1471 n.1 (Fed. Cir. 1989) (the application of principles of claim preclusion and issue preclusion is not a matter committed to the exclusive jurisdiction of the Federal Circuit, so the court looks to the law of the circuit to which an appeal would lie in non-patent cases from the particular district court).

Seventh Circuit and the Federal Circuit have all said that courts should not apply non-mutual offensive collateral estoppel (or issue preclusion), which is what this is, if it would be unfair to the defendant. *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331 (1979); *Century*, 125 F.3d at 531; *A.B. Dick*, 713 F.2d at 702. The court should refuse to apply issue preclusion if, for example, the defendant had little incentive to defend vigorously in the first suit because he was sued for small or nominal damages, or if the first judgment is inconsistent with one or more previous judgments in the defendant's favor, or if the second action affords the defendant procedural opportunities (e.g., discovery procedures) unavailable in the first action that could cause a different result. *See Parklane*, 439 U.S. at 330-31, *cited in Century*, 125 F.3d at 531. Nor should the doctrine be applied "when the issue is of general interest and has not been resolved by the highest appellate court that can resolve it." *Century*, 125 F.3d at 531 (citing Restatement §29 Comment i; *United States v. Alcan Aluminum Corp.*, 990 F.2d 711, 719 (2d Cir. 1993)). The Seventh Circuit has held that "determining 'whether or not application of [issue preclusion] is fair depends upon a case by case analysis,' and that courts should be sensitive to the 'practical realities which surround the parties.'" *Century*, 125 F.3d at 531 (quoting *Butler v. Stover Brothers Trucking Co.*, 546 F.2d 544, 551 (7th Cir. 1977)). Thus, in *Century*, where the issue involved the validity of the PBGC's regulation delaying withdrawal liability payments when an employer has filed for arbitration, the court refused to apply the doctrine to prevent the employer from relitigating the regulation's validity because the issue decided was an unmixed question of law that was likely to arise again, all other courts to consider the issue had come out the other way, and the district court failed to distinguish any of those cases. *Id.* at 532.

This case does not appear to fall within any of these exceptions. The record suggests that

4

Abbott and Tokyo Tanabe defended the *Forest* case with vigor, there are no judgments concerning the Tanabe patents that are inconsistent with Judge Arcara's, and the discovery procedures available in this Court are likely the same as those available in the *Forest* case. Although it is true that the Federal Circuit has not yet ruled on whether Judge Arcara correctly construed the patent claims in the *Forest* case, this issue is not a matter of general interest; indeed, the universe of parties who have an interest in how these claims are construed is quite small. And although claim construction presents a purely legal question, see *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 977-78 (Fed. Cir. 1995) (en banc), *aff'd* 517 U.S. 370 (1996), the issue of how these particular claims should be construed is unlikely to arise again.

There appear to be only two reported decisions in which the court was asked to consider the preclusive effect to be given the claim construction decision of a prior court involving the same patents and the same patent holders but not the same opposing party. Sadly, the courts deciding those two cases reached opposite results. In *TM Patents, L.P. v. International Business Machines Corp.*, 72 F.Supp. 2d 370 (S.D.N.Y. 1999), the district court held that issue preclusion foreclosed the patent holder from relitigating the meaning of certain claim limitations that had already been raised and litigated in a prior infringement action. In deciding to apply the doctrine, the court analyzed precedent--not only *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996), which emphasized the need to promote uniformity in the meaning to be given a particular patent's claims and to that end took the question of claim construction away from the jury and handed it to the judge--but the cases leading up to that decision as well:

> Even prior to *Markman*, the Federal Circuit had held that determination of the scope of a patent claim in a prior infringement action could have [issue preclusive] effect against the patentee in a subsequent case. *See Pfaff v. Wells*

*Elec. Inc.*, 5 F.3d 514, 517-18 (1993). After *Markman*, with its requirement that the Court construe the patent for the jury as a matter of law, it is inconceivable that a fully-litigated determination after a first *Markman* hearing would not be preclusive in subsequent actions involving the same disputed claims under the same patent. The nature of the *Markman* proceeding is such that finality is its aim. *Id.* at 377.

By contrast, in *Graco Children's Products, Inc. v. Regalo International, LLC*, 77 F.Supp. 2d 660 (E.D. Pa. 1999), the court concluded that issue preclusion did not apply to bar relitigation of claim construction issues. In so doing, the court recognized that "by instructing courts to decide issues of claim construction in patent cases, the Court in *Markman* recognized the importance of uniformity in the treatment of a given patent." *Id.* at 663. But, the court reasoned, even *Markman* did not require courts to apply issue preclusion in every case; "circumstances may exist where . . . despite a previous court having held a hearing on the claim construction of a patent pursuant to *Markman*, [issue preclusion] will not apply to such decisions." *Id.* at 663, 665. Given the particular circumstances of the *Graco* case (Graco lost on the claim construction issues but won on the ultimate infringement issue and so could not have appealed the claim construction decision), this Court does not necessarily disagree with the outcome reached in that case. But such circumstances are not present in this case. Unlike Graco, Abbott and Tokyo Tanabe lost on both the claim construction issues and the infringement issue, and they can and have appealed. Although that appeal has not yet been decided, the law in the Seventh Circuit is clear that exhaustion of appellate remedies is not a normal requirement of issue preclusion, and a final judgment by a district court has preclusive effect even though judgment is pending on appeal. *See, e.g., Amcast Industrial Corp. v. Detrex Corp.*, 45 F.3d 155, 160 (7th Cir. 1995); *Prymer v. Ogden*, 29 F.3d 1208, 1213 n.2 (7th Cir.), *cert. denied*, 513 U.S. 1057 (1994).

Additionally, in *Graco* the claim construction was not the reason for the loss; here it was. Because of the way he construed the claims, Judge Arcara found that no reasonable trier of fact could find that Forest's product infringed the Tanabe patents. For these reasons, the Court does not believe it would be unfair to apply the doctrine of issue preclusion in this case. The Court finds that Judge Arcara's construction of "surface active material" and "based on dry weight" are binding on this Court.

The Court notes that even if it were not bound to follow Judge Arcara's ruling, it would nonetheless apply the same claim construction--at least with respect to the meaning of the phrases "surface active material" and "based on the dry weight of the material." Judge Arcara's reasoning on these points is persuasive. The plaintiffs argue that Judge Arcara's construction of these claim terms was "plainly wrong" for several reasons, and that they should therefore be permitted to relitigate the claim construction issues anew in this Court. There is some authority for the proposition that a "plainly wrong" determination may not be entitled to preclusive effect, *see* Restatement (2d) of Judgments §29(8) and cmt. j (1980), but the Court does not believe that exception would cover the situation presented here. Section 29(8) instructs that a court need not apply issue preclusion if "other circumstances justify affording [the losing party] an opportunity to relitigate the issue"; comment j instructs that the "other circumstances" that may be important include "disclosure that the prior determination was plainly wrong or that new evidence has become available that could likely lead to a difference result." The fact that these two circumstances are linked in the same comment suggests that the "disclosure that the prior determination was plainly wrong" would not come from a second court revisiting the merits of the first court's decision, but from new evidence or a change in facts or circumstances. The

7

Restatement does not seem to contemplate a second court being able to revisit the merits of the prior determination, as the plaintiffs urge here. Indeed, such an exception would make no sense in light of the purpose behind the doctrine of issue preclusion, which is to place the first judgment beyond question by subsequent courts; if the second court is going to examine the first court's decision to decide if it was right or wrong, what is the point of having issue preclusion to begin with?

Moreover, the Court does not believe Judge Arcara's decision was "plainly wrong." In support of its argument in this regard, the plaintiffs first argue that Judge Arcara should not have read a temporal limit into the term "surface active material" because the claims do not limit that term to dry powder or impose a temporal element on that material. The Court disagrees. The claims clearly contemplate that the "surface active material" exists first, and then, after a "pharmaceutically acceptable carrier" is added to the surface active material, the surface active material ceases to exist and becomes a "pharmaceutical composition." *See, e.g.*, U.S. Patent No. 4,397,839, at col. 18, lines 15-19. As Judge Arcara noted, it was undisputed that the chemical composition of the lung surfactant extract material changes when it is added to water (one of the claimed elements of the "pharmaceutically acceptable carriers," *see id.*, col. 18, lines 26-28). If that is the case--and the parties in this case certainly seem to agree that it is--once the pharmaceutically acceptable carrier is added to the surface active material, the surface active material no longer exists, or at least it does not exist in the same form.

Second, the plaintiffs argue that Judge Arcara's construction of "surface active material" is wrong because a solid, which is what the surface active material must be under Judge Arcara's view, cannot be added "dropwise" as required by claim 1, and cannot be administered orally or

8

intraperitoneally (through a syringe) as discussed in the specification. The plaintiffs have not explained why this is so, however. In fact, their argument seems to assume that the terms "solid" and "liquid" are black and white, and that only "liquids" can be dropped or put into a syringe. Not that the Court has any particularized knowledge about the specific state of matter of the "surface active material" described in the patent, but as a matter of common sense, some "solids" are more solid (in the sense of being unmalleable) than others. For example, cake frosting and toothpaste, which most people probably think of as solids, can be added dropwise onto a surface, which is what the claims of the patent contemplate. So just saying something is a "solid" does not necessarily mean that it cannot be made to perform in the ways required under the patent. More importantly, the intraperitoneal insertion language comes from the examples provided in the specification, not from the claims themselves, and it therefore may not be read into the claims. *See, e.g., Laitram Corp. v. Cambridge Wire Cloth Co.*, 863 F.2d 855, 865 (Fed. Cir.1988) ("References to a preferred embodiment, such as those often present in a specification, are not claim limitations."); *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir.1988) ("Although the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.").

The plaintiffs next argue that Judge Arcara's claim construction was wrong because he held that claim 1 is a subset of claim 9, which is impossible if claim 9 depends from claim 1, which it unquestionably does. The Court disagrees with this characterization of the ruling. Judge Arcara did not hold that claim 1 depended from claim 9; rather, he held (correctly in this Court's view) that the "surface active material" claimed in claim 1 is one component of the

"pharmaceutical composition" claimed in claim 9. The plain language of the claims makes this much clear; claim 9 claims "[a] pharmaceutical composition . . . comprising an effective amount of a surface active material as set forth in claim 1 and a pharmaceutically acceptable carrier thereof." U.S. Patent No. 4,397,839, col. 18, lines 15-19.

Tying this argument in with their point that a solid cannot be inserted intraperitoneally, the plaintiffs argue that Judge Arcara was wrong to infer that "surface active material" is a solid because even Dey's own surfactant expert, Joseph Zasadzinski, testified that the phrase did not "fit within a particular state of matter." *See* Plaintiffs' Brief on the Correct Construction of [Claim Terms], p. 8 (quoting Zasadzinski's deposition testimony). But the deposition excerpt makes clear that Zasadzinski was asked to define the phrase as a general proposition, whereas Judge Arcara was asked to define that phrase as it used in the context of the '301 and '839 patents. Those patents define "surface active material" as something that must be combined with water and physiological saline (i.e., made more liquid) to form the "pharmaceutical composition" to be used in treating RSD. *See* U.S. Patent No. 4,397,939, col. 18, lines 15-19, 26-31. Judge Arcara was right to conclude that "surface active material" and "pharmaceutical composition," as used in the patent, do not mean the same thing.

As further evidence that "surface active material" is not limited to a solid state, the plaintiffs offer a copy of the extension it received from the PTO under 35 U.S.C. §156. The plaintiffs reason that because the patentee submitted "testing conducted on the *post-suspension* product Survanta,® but did not submit any testing on a 'dry' precursor product" in support of its application for the extension, and because the PTO granted the extension, the PTO necessarily found that Survanta® was a "surface active material" within the meaning of claim 1. *See*

10

Plaintiffs' Brief on the Correct Construction of [Claim Terms], at 7-8. This evidence is extrinsic and, absent an ambiguity in the patent's claims, specification and prosecution history (which is lacking here), it should not be considered in determining what the claims of the patent actually mean; certainly, this evidence cannot be used to contradict the claim construction unambiguously apparent from the intrinsic evidence. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996); *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1309 (Fed. Cir. 1999). Moreover, the granting of the extension appears to have had nothing to do with determining what the claims of the patent mean, and even if it did, the PTO is not required to interpret a patent's claims in the same manner as courts are required to during infringement proceedings, *see In re Morris*, 127 F.3d 1048, 1053 (Fed. Cir. 1997), which means that the PTO's claim interpretation would in no way be binding on Judge Arcara or on this Court.

Finally, the plaintiffs argue that Judge Arcara's ruling prevents the patentee from determining whether a publicly-available product produced by a potential infringer actually infringes the '839 patent because they would have to test the precursor to the publicly-available product--what Dey has referred to in court as "the paste"--which may well be unavailable to test (indeed, plaintiffs have had some difficulty obtaining it from Dey in this case). This is the most compelling (indeed the only compelling) of all the plaintiffs' arguments. The Court is mindful that the claims as construed require the plaintiffs to test the precursor, which may mean that the patent holder and licensees have to file an infringement suit just to have access to that material to determine whether it infringes the '839 patent. But that is, in fact, what the claims as written require, and the Court is neither willing nor able to rewrite the claims to alleviate this potential hurdle to enforcement of the patent rights. *See K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1364-

65 (Fed. Cir. 1999) ("Courts do not rewrite claims; instead, we give effect to the terms chosen by the patentee.") (citing *Texas Instruments Inc., v. International Trade Commission*, 988 F.2d 1165, 1171 (Fed. Cir. 1993)).

Prosecution History and the Doctrine of Equivalents

Claim 1 of the '301 and '839 patents specifies certain percentage ranges within which the components of the surface active material must fall. For example, the '301 patent claims a "[s]urface active material . . . characterized in that the phospholipid content is 75.0-95.5%, the neutral lipid content is 1.8-14.0%, the total cholesterol content is 0.0-3.0%, the carbohydrate content is 0.1-1.5%, the protein content is 0.5-5.0% and water content is 1.7-6.0%, all based on the dried weight of said material . . . ." U.S. Patent No. 4,338,301 at col. 17, lines 59-68. And the '839 patent claims a "surface active material . . . characterized in that the overall phospholipid content is 68.6-90.7%, the overall neutral fat content is 0.3-13.0%, the total cholesterol content is 0.0-8.0%, the overall free fatty acid content is 1.0-27.7%, the carbohydrate content is 0.1-2.0%, the protein content is 0.0-3.5%, and the water content is 2.1-5.2%, all based on the dry weight of the material. . . ." U.S. Patent No., 4,397,839, at 17, lines 13-25. The plaintiffs allege that Dey's product infringes all of the elements of claim 1, some literally because Dey's product contains some of the components in percentages that fall within the ranges specified in the claim, and one under the doctrine of equivalents because Dey's product contains phospholipid in a percentage that falls outside the range given in the claim but is not substantially different from that specified in the claim.[4] Dey claims that the plaintiffs are

---

[4]These allegations are based on testing the plaintiffs did not on the precursor of the final
(continued...)

12

precluded from arguing infringement under the doctrine of equivalents because of arguments and amendments made during Tanabe's prosecution of the '301 patent. The plaintiffs disagree, arguing that nothing in the prosecution history of either the '301 or the '839 patents suggests that Tanabe intended to limit its right to exclude products containing the claimed components in percentages different from those claimed.

"If an asserted claim does not literally read on an accused product, infringement may still occur under the doctrine of equivalents if there is not a substantial difference between the limitations of the claim and the accused product." *Bayer AG v. Elan Pharmaceutical Research Corp.*, No. 99-1365, 2000 WL 572705, at *8 (Fed. Cir. May 12, 2000) (citing *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29, 39-41 (1997)). The doctrine is not unlimited, however, and "[p]rosecution history estoppel is one limitation on the scope of equivalents that a patentee can claim under the doctrine of equivalents." *Bayer*, 2000 WL 572705, at *8 (citing *Warner-Jenkinson*, 520 U.S. at 30). Prosecution history estoppel excludes from the range of equivalents subject matter surrendered during prosecution of the application for the patent; whether it applies is a question of law. *Cybor Corp. v. FAS Technologies, Inc.*, 138 F.3d 1448, 1460 (Fed. Cir. 1998). Prosecution history estoppel can occur as a result of amendments made to overcome patentability rejections or as a result of arguments made during prosecution that show "a clear and unmistakable surrender of subject matter." *Bayer*, 2000 WL 572705, at *8 (quoting *Sextant Avionique, S.A. v. Analog Devices, Inc.*, 172 F.3d 817, 828 & n.3 (Fed. Cir.

---

[4](...continued)
Curosurf® product, but rather on a compound formed by drying the final product. The plaintiffs have not yet revealed the results of the tests they did on the precursor.

13

1999)); *Cybor*, 138 F.2d at 1460.

After reviewing the prosecution history of both patents, the Court agrees with Dey that Tanabe and the plaintiffs are estopped from arguing infringement based on the doctrine of equivalents with respect to the ranges claimed for the specified components of the surface active material. As originally submitted to the PTO, the '301 patent claimed:

> 1. Surface active material containing phospholipid, neutral lipid, total cholesterol, carbohydrate and protein, all of which are present in the lung tissue of a mammal, characterized in that the phospholipid content is 75.0-95.5%, the neutral lipid content is 1.8-14.0%, the total cholesterol content is 0.0-3.0%, the carbohydrate content is 0.1-1.5% and the protein content is 0.5-5.0%, all based on the dried weight of said material." *See* Application for U.S. Patent No. 4,338,301, Prosecution History at p. 45, lines 4-11.

During the first office action, the patent examiner rejected this claim because he thought it should say "obtained from lung tissue" rather than "present in lung tissue." *See id.* at 52. Tanabe made this change, as well as others not relevant for our purposes. The second time around, the patent examiner rejected the claim (now recast as claim 16) "as being prima facie obvious (35 USC 103) over the three references supplied by applications and herein cited."[5] *Id.* at 68. The examiner advised that Tanabe "should rebut these references on the record. Note that these references show products quite proximate to those being claimed." *Id.* In response to the examiner's rejection of the claim, Tanabe amended it (now re-labeled as claim 41) to add a statement concerning "the minimum and maximum surface tension ranges of the material estimated in Wilhelmy's method wherein the material is added dropline to the surface of physiological saline . . . ." *Id.* at 73. Tanabe did not change anything relating to the components'

---

[5]The references were a 1972 article by King, et al.; a 1978 article by Adams, et al.; and a 1975 article by Harwood, et al. *See id.* at 70.

14

percentage ranges, but it explained the amendments to this claim and responded to the examiner's concerns about the cited references as follows:

> To better define, and distinguish the inventive substance over any substances which might be shown by the [three references noted by the examiner], the specific characteristics of the inventive surface active agent, with regard to the result of Wilhelmy's method test is set forth in the claim. . . . None of the three references disclose any substance similar to the substance defined by claim 41.
>
> The composition of the surface-active material isolated according to the invention is also not particularly shown in any of the references.
> \* \* \*
> While the references disclose chemical compositions and physiological functions of mammal pulmonary surfactants, they do not demonstrate that their substances have a clear effect on "HMD." . . . The inventors of the invention covered by this application have studied the suggestions of these three references and discovered, through experimentation, *that only a surface active material having the chemical composition claimed and disclosed in Table I at page 4 of the application under the heading "Composition of the Material" have the property of rapid spreading and of ultra-alveolar surface tension reduction.*
> \* \* \*
> Accordingly, it is believed all of the claims define a patentable invention over the cited references, whether these references are taken separately or in combination. *Id.* at 79-80 (emphasis added).

Although these remarks were made in connection with the prosecution of the '301 patent, they apply with equal force to the '839 patent, which claims an improvement of the '301 patent, and the application for which was filed after the above remarks were made. *See* Application for U.S. Patent No. 4,338,301, p. 18, line 18 - p. 19, line 5.

These remarks clearly suggest that Tanabe intended to distinguish the particular composition of his invention and to limit his invention to surface active material specifically comprised of the components listed in the percentage amounts specified. Tanabe specifically distinguished the patented invention by the composition as specified in the included table, which listed the appropriate percentage ranges for each of the components of the material. It is true, as

15

the plaintiffs argue, that arguments made during prosecution of the patent application must be viewed in context, and that not every statement made by a patentee during prosecution to distinguish prior art references creates a separate estoppel. *See Read Corp. v. Portec, Inc.*, 970 F.2d 816, 824 (Fed. Cir. 1992). But the language quoted above, when viewed in the context of the entire application file for the '301 patent, evidences a clear intent to limit the patent to material containing the specified components in the specified ranges. The examiner made it quite clear that he viewed the invention as claimed to read on the materials described in the cited references; to get around those references and obtain a patent for an otherwise unpatentable invention, Tanabe explained that the claimed invention, when limited to the components specified, combined in the percentages specified, was different from the inventions covered by the three articles cited. In so doing, Tanabe relinquished the right to exclude other materials comprised of components in percentages falling outside the ranges specified. Neither Tanabe nor the plaintiffs can now reclaim that right by invoking the doctrine of equivalents.

Dated: June 28, 2000

                                                    MATTHEW F. KENNELLY
                                                    United States District Judge